

# COPY

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
IN ADMIRALTY
CIVIL ACTION NO. 4:04-CV-63-H2

| | |
|---|---|
| IN THE MATTER OF THE ) | |
| COMPLAINT OF SEA TOW ) | |
| SERVICES OF CARTERET ) | <u>VIDEOTAPED</u> |
| COUNTY, INC. D/B/A/ SEA ) | D-E-P-O-S-I-T-I-O-N |
| TOW BEAUFORT ) | |
| AS OWNER OF THE M/V GREEN ) | OF |
| HORNET FOR EXONERATION ) | |
| FROM OR LIMITATION OF ) | DONALD WAYNE DAVIS |
| LIABILITY. ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

NOVEMBER 19, 2004, AT WHEATLY, WHEATLY, NOBLES, WEEKS,
VALENTINE & LUPTON, P.A., 710 CEDAR STREET, BEAUFORT, NORTH
CAROLINA


APPEARANCES OF COUNSEL:


FOR GEORGE WALKER    -    STEVENSON L. WEEKS, ESQ.

                          WHEATLY, WHEATLY, NOBLES, WEEKS,
                           VALENTINE & LUPTON, P.A.
                          ATTORNEYS AT LAW
                          710 CEDAR STREET
                          BEAUFORT, NC 28516


FOR SEA TOW         -    JAMES L. CHAPMAN, IV, ESQ.
SERVICES OF
CARTERET COUNTY          CRENSHAW, WARE & MARTIN, P.L.C.
                          ATTORNEYS AT LAW
                          1200 BANK OF AMERICA CENTER
                          NORFOLK, VA  23510


IN ATTENDANCE       -    MARTIN BOLSTER

COURT REPORTER      -    O.D. LANDRY, CVR-CM-HM

TRANSCRIBED BY      -    DEBORAH STONE

COASTAL COURT-REPORTING AGENCY, INC.
P.O. BOX 788
NEWPORT, NORTH CAROLINA 28570
TEL: (252) 223-4045
FAX: (252) 223-3663

EXHIBIT
2

## EXAMINATION OF THE WITNESS

BY MR. CHAPMAN:   1 - END.

BY MR. WEEKS:      (DID NOT EXAMINE.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## INDEX OF EXHIBITS

FOR GEORGE WALKER

 NONE

FOR SEA TOW SERVICES OF CARTERET COUNTY

   [12]   REPORT OF MISTER DAVIS  . . . . . . . . . . . . . . .2

   [13]   U.S. MERCHANT MARINE OFFICER CERTIFICATE OF . . . . .4

         MISTER DAVIS FROM THE UNITED STATED COAST GUARD

**Coastal Court-Reporting Agency, Inc.**
P.O. Box 788, Newport, North Carolina, 28570

```
 1              THE OFFICER:  AT THIS TIME, THE DEPOSITION OF

 2   DON DAVIS IS BEING TAKEN IN CIVIL ACTION NUMBER 4:04CV-63-H2,

 3   PENDING IN AND BEFORE THE UNITED STATES DISTRICT COURT FOR

 4   THE EASTERN DISTRICT OF NORTH CAROLINA, EASTERN DIVISION, IN

 5   ADMIRALTY, STYLED, IN THE MATTER OF THE COMPLAINT OF SEA TOW

 6   SERVICES OF CARTERET COUNTY, INC., D/B/A SEA TOW FOR

 7   EXONERATION FROM OR LIMITATION OF LIABILITY, COMMENCING AT

 8   APPROXIMATELY 2:20 O'CLOCK P.M., FRIDAY THE 19TH DAY OF

 9   NOVEMBER, 2004, AT THE LAW OFFICES OF WHEATLY, WHEATLY,

10   NOBLES, WEEKS, VALENTINE AND LUPTON, P.A., 710 CEDAR STREET,

11   IN THE TOWN OF BEAUFORT, COUNTY OF CARTERET, STATE OF NORTH

12   CAROLINA.

13              THE COURT REPORTER TAKING THIS DEPOSITION IS

14   O.D. LANDRY OF COASTAL COURT-REPORTING AGENCY, INC., NEWPORT,

15   NORTH CAROLINA.

16              THE VIDEO TECHNICIAN OPERATING THE CAMERA IS

17   MISTER JOHN CREECH OF AMERICAN MEDIA PRODUCTIONS, MOREHEAD

18   CITY, NORTH CAROLINA.

19              WILL COUNSEL PLEASE STATE THEIR APPEARANCES FOR

20   THE RECORD?

21              MR. WEEKS:  STEVE WEEKS, REPRESENTING GEORGE

22   WALKER.

23              MR. CHAPMAN:  JAMES CHAPMAN, REPRESENTING SEA

24   TOW SERVICES OF CARTERET, INC., THE LIMITATION PLAINTIFF IN

25   THIS CASE.
```

1

1    A.   I THINK SO.

2    Q.   YOU HAVE LISTED ON YOUR SUMMARY OF

3  QUALIFICATIONS THERE SOME "RELATED EMPLOYMENT" ON THE FIRST

4  PAGE.   I JUST WANT TO ASK YOU A FEW QUESTIONS ABOUT THAT.

5         IT SAYS HERE YOU WORKED FOR CARTERET TOWING AND

6  MOREHEAD CITY TOWING?

7    A.   CORRECT.

8    Q.   WHAT DATES DID YOU WORK FOR EACH OF THOSE

9  COMPANIES?

10   A.   AT VARIOUS TIMES.   CARTERET TOWING WOULD HAVE

11 BEEN IN THE 70'S, UP UNTIL THE LATE 70'S.   AND I WORKED FOR

12 MOREHEAD TOWING PROBABLY ABOUT TEN YEARS AGO.

13   Q.   HOW LONG DID YOU WORK FOR MOREHEAD?

14   A.   FOR MOREHEAD TOWING, APPROXIMATELY TWO YEARS.

15   Q.   SO HOW LONG WAS IT WITH CARTERET THEN; YOU SAID,

16 DURING THE 1970'S, BUT HOW MANY YEARS?

17   A.   I WORKED FOR THEM OFF AND ON FOR PROBABLY TEN

18 YEARS.

19   Q.   SO WOULD THAT BE A TOTAL OF TEN YEARS

20 CUMULATIVELY?

21   A.   A TOTAL OF TEN YEARS, CUMULATIVE.   I WORKED

22 BEFORE I WENT IN THE COAST GUARD, AND THEN I WORKED AFTER MY

23 FOUR YEARS THAT I WAS IN THE COAST GUARD AND CAME BACK HOME.

24   Q.   THEN MOREHEAD CITY TOWING, YOU WORKED FOR THEM

25 FOR A COUPLE OF YEARS, BUT ABOUT TEN YEARS AGO?

4

1    A.   YES, SIR.  I WORKED FOR THEM ON A PART-TIME

2  BASIS AND SOME FULL-TIME WORK, BUT MOSTLY, IT WAS ON A PART-

3  TIME BASIS.

4    Q.   SO THAT WOULD HAVE BEEN SAY EARLY 1990'S, THE

5  COUPLE OF YEARS?

6    A.   APPROXIMATELY.

7    Q.   WHEN YOU WORKED FOR CARTERET IN THE 70'S, DID

8  YOU HAVE A 1600 TON LICENSE?

9    A.   NO.

10   Q.   DID YOU WORK AS A DECKHAND?

11   A.   MASTER OF TOWING VESSELS.

12   Q.   WHAT LICENSE DID YOU HOLD THEN?

13   A.   MASTER OF TOWING VESSELS.  THAT'S AN UNINSPECTED

14  LICENSE.

15   Q.   WOULD THAT HAVE BEEN, YOU KNOW, TYPICAL RIVER

16  TYPE WORK, MOVING BARGES UP AND DOWN?

17   A.   BARGES, TOWING, SHIP DOCKING, AND TOWING

18  DREDGES, TOWING VESSELS OFF, IF THEY WERE GROUNDED, IF THEY

19  WERE LARGE ENOUGH THAT WE GOT INVOLVED, THAT TYPE OF THING.

20   Q.   ANY OFFSHORE TOWING?

21   A.   LET ME THINK.  WE DID A FEW OFFSHORE TOWING

22  JOBS, NOT A LOT.  WE REALLY DIDN'T HAVE ANY EQUIPMENT CAPABLE

23  OF THAT.

24          WE DID SOME RESCUE WORK FOR VESSELS.  IN FACT,

25  THE COAST GUARD LOST A VESSEL THAT WENT ONTO CAPE SHOALS THAT

5

1       THE DOCTRINE, YOU KNOW, THAT THE GOVERNMENT DOES
2   NOT INTERFERE WITH PRIVATE ENTERPRISE, HAS BEEN AROUND A
3   WHOLE LOT LONGER THAN THE ACTUAL IMPLEMENTATION OF IT.  I CAN
4   REMEMBER IT BACK IN THE LATE 60'S AND 70'S.  IT WAS SOMETHING
5   THAT ALWAYS CAME UP AS A CONTROVERSY AS I WORKED FOR TOWING
6   COMPANIES, THAT THEY WOULD SOMETIMES ARGUE WITH THE COAST
7   GUARD THAT THEY SHOULD NOT BE DOING SOME OF THE THINGS THAT
8   THEY DID.  IN FACT, IT SHOULD HAVE BEEN LEFT TO PRIVATE
9   ENTERPRISE.  SO THAT'S BEEN AROUND FOR A LONG TIME, BUT AS
10  FAR AS ON A SMALL BOAT BASIS, IT'S SOMETHING THAT HAS EVOLVED
11  OVER TIME, UNTIL IT BECAME A HARD FAST COAST GUARD DOCTRINE.
12       OF COURSE, THE COAST GUARD STILL WILL GET IN THE
13  ASSISTANCE TOWING.  IT'S UP TO THE COMMAND AND THE PEOPLE
14  INVOLVED, AND THERE ARE CERTAIN CRITERIA FOR THAT, WHICH
15  INVOLVE, IS THE CIVILIAN ASSISTANT CAPABLE OF PERFORMING THE
16  OPERATION.  IF THEY DON'T DEEM SO, THEN, OF COURSE, THEY CAN
17  ALWAYS STEP IN.  SO THERE ARE THINGS THAT ARE INVOLVED.
18       Q.   IN YOUR PERSONAL EXPERIENCE, WHEN IS THE LAST
19  TIME, AS A COAST GUARD RESERVIST, YOU, PERSONALLY,
20  PARTICIPATED IN A RESCUE OPERATION THAT INVOLVED PULLING A
21  BEACHED BOAT OFF THE SAND, OR OFF THE ROCKS?
22       A.   I DON'T RECALL.
23       Q.   WOULD IT BE FAIR TO SAY THAT IT WAS MORE THAN
24  TEN YEARS AGO?
25       A.   YES.

12

1        Q.    MORE THAN FIFTEEN YEARS AGO?

2        A.    MOST LIKELY.

3        Q.    I TAKE IT THAT EARLIER IN YOUR COAST GUARD

4  RESERVE EXPERIENCE, IT WAS SOMETHING THAT YOU DID, OR

5  PARTICIPATED IN PERSONALLY FROM TIME TO TIME?

6        A.    NOT ONLY IN MY RESERVE, BUT ALSO IN MY REGULAR

7  EXPERIENCE, QUITE EXTENSIVELY.

8        Q.    WORKING FOR THE TOWING COMPANIES?

9        A.    NO, SIR, FOR THE COAST GUARD.

10       Q.    YOU MEAN, BACK WHEN YOU WERE ON ACTIVE DUTY?

11       A.    CORRECT.

12       Q.    FROM '66 TO '70?

13       A.    UH-HUH.  YOU SPECIFIED, "RESERVE," AND I'M JUST

14  CLARIFYING.  WE ALSO DID IT IN THE REGULAR COAST GUARD, NOT

15  JUST THE RESERVE.

16       Q.    DID YOU GRADUATE FROM HIGH SCHOOL?

17       A.    YES.

18       Q.    WHEN?

19       A.    1964.

20       Q.    WHERE?

21       A.    BEAUFORT.  THAT'S THE FRENCH PRONUNCIATION.

22       Q.    COLLEGE?

23       A.    YES.

24       Q.    GRADUATE?

25       A.    NO.

13

```
1        Q.    HOW MANY YEARS?

2        A.    TWO YEARS.

3        Q.    WHAT MAJOR WERE YOU PURSUING?

4        A.    MARINE BIOLOGY.

5        Q.    I TAKE IT THAT WHILE YOU WERE IN THE COAST GUARD

6    RESERVE, YOU WERE ALSO WORKING FOR THE COMPANIES THAT HAD

7    SOME MARITIME ACTIVITY?

8        A.    FOR THE MOST PART, YES, SIR.

9        Q.    AND THAT WOULD HAVE INCLUDED CARTERET TOWING,

10   MOREHEAD CITY TOWING?

11       A.    YES.  I THINK IT WAS STILL CARTERET TOWING, AND

12   THEN IN LATER DAYS OF THEIR EXISTENCE.

13       Q.    AND THE DEPARTMENT OF INTERIOR?

14       A.    YES.

15       Q.    HAVE YOU EVER WORKED FOR A COMMERCIAL ENTERPRISE

16   THAT HAD AS ITS BUSINESS PROVIDING TOWING AND SALVAGE

17   SERVICES TO RECREATIONAL VESSELS?

18       A.    NO, EXCEPT FOR THE TOWING COMPANY.  LET ME

19   CLARIFY THAT.

20       Q.    AND I TAKE IT THEN THAT AT LEAST FOR THE PERIOD

21   OF TIME THAT YOU WORKED FOR CARTERET AND MOREHEAD CITY, THERE

22   WERE OCCASIONS WHEN YOU WOULD PROVIDE EITHER TOWING

23   ASSISTANCE OR SALVAGE ASSISTANCE TO RECREATIONAL VESSELS THAT

24   WERE IN DISTRESS?

25       A.    YES.
```

14

1       Q.    HAVE YOU EVER BEEN INVOLVED IN THE SALVAGE OF A

2    BEACHED HOBIE CAT?

3       A.    NO.

4       Q.    HOW ABOUT ANY BEACHED SAILING VESSEL?

5       A.    YES.

6       Q.    MONOHAUL?

7       A.    CORRECT.

8       Q.    WHEN WAS THE LAST TIME THAT YOU DID THAT?

9       A.    I DON'T RECALL EXACTLY.  I WOULD ASSUME SOMETIME

10   IN THE 80'S, MAYBE EARLY 90'S, BUT SOMEWHERE IN THAT TIME

11   FRAME.  TEN YEARS, I'D SAY TEN YEARS.

12       Q.    NOW, ON YOUR C.V., OR YOUR SUMMARY OF

13   QUALIFICATIONS, ITEM (3) ON PAGE 2, SAYS THAT YOU'RE A MARINE

14   SURVEYOR AND ACCIDENT INVESTIGATOR?

15       A.    CORRECT.

16       Q.    IS THAT THE BUSINESS OF THIS COMPANY, MARITIME

17   SERVICES, INC.?

18       A.    YES.

19       Q.    OBVIOUSLY, IT'S A CORPORATION?

20       A.    YES.

21       Q.    ORGANIZED UNDER NORTH CAROLINA LAW?

22       A.    YES.

23       Q.    ARE YOU THE SOLE STOCKHOLDER?

24       A.    NO.

25       Q.    THERE ARE OTHER STOCKHOLDERS?

15

1    A.    SHE IS NOT.

2    Q.    I SHOULD SPELL THAT OUT; NATIONAL ASSOCIATION OF

3    MARINE SURVEYORS?

4    A.    CORRECT.

5    Q.    SO THAT WE'LL KNOW WHAT IS MEANT BY THAT

6    ACRONYM.

7         IT SAYS YOU'VE BEEN DOING THAT SINCE 1979?

8    A.    YES.

9    Q.    WHAT DO YOU DO AS A SURVEYOR; TELL ME WHAT'S

10   INVOLVED IN THAT BUSINESS?

11   A.    THERE ARE SEVERAL FACETS TO WHAT WE DO.  I

12   INSPECT VESSELS STRUCTURALLY, OPERATIONALLY, FOR INSURANCE

13   UNDERWRITERS, WE DETERMINE THEIR SUITABILITY FOR THEIR

14   INTENDED SERVICE, ALSO, THEIR CONDITION, THE CONDITION OF

15   THEIR EQUIPMENT.  WE DO VALUATIONS OF THE VESSEL, HERE AGAIN,

16   FOR INSURANCE UNDERWRITERS AND FINANCIAL INSTITUTIONS.  WE

17   LOOK AT MARINE ACCIDENTS.  WE LOOK AT STRUCTURAL DAMAGE TO

18   VESSELS.  WE LOOK AT THE CAUSE AND ORIGIN OF MARINE FIRE AND

19   OF MARINE ACCIDENTS FOR, HERE AGAIN, INSURANCE UNDERWRITERS

20   AND FOR LEGAL PURPOSES.

21   Q.    AND MARINE ACCIDENTS WOULD BE IN THE NATURE OF

22   VESSEL COLLISIONS?

23   A.    COLLISIONS.

24   Q.    SINKINGS?

25   A.    SINKINGS.

17

Case 4:04-cv-00063-V   Document 34-3   Filed 04/14/06   Page 10 of 22

1       Q.    COLLISIONS?

2       A.    COLLISIONS.

3       Q.    ISSUES RELATED TO WHETHER THE RULES OF THE ROAD

4 WERE FOLLOWED?

5       A.    CORRECT.

6       Q.    WHICH I ASSUME YOU'RE FAMILIAR WITH; YOU'VE

7 REFERENCED THEM IN YOUR REPORT?

8       A.    YES, SIR.

9       Q.    JUST SO I'M CLEAR, THERE AREN'T ANY RULES OF THE

10 ROAD ISSUES RAISED BY THIS CASE, ARE THERE?

11      A.    NOT TO MY KNOWLEDGE.

12      Q.    WHEN DID YOU BECOME A MEMBER OF THE NATIONAL

13 ASSOCIATION OF MARINE SURVEYORS?

14      A.    AT LEAST TWENTY YEARS.

15      Q.    THE SURVEYING WORK THAT YOU DO, IS IT LIMITED TO

16 A PARTICULAR TYPE OR CLASS OF VESSELS?

17      A.    YES.

18      Q.    WHAT ARE THOSE?

19      A.    CLASS OF COMMERCIAL, TUGS, BARGES, RECREATIONAL

20 VESSELS, A HUNDRED TONS AND UNDER.

21      Q.    SO ANY COMMERCIAL VESSEL?

22      A.    TUGS AND BARGES, SMALL FREIGHT BOATS, BUT VERY,

23 VERY LIMITED.

24      Q.    SO TUGS, HOW LARGE WOULD YOU CONSIDER YOURSELF

25 TO BE COMPETENT TO SURVEY; ANY SIZE TUG?

18

1   HOBIE 16 THAT'S INVOLVED IN THIS CASE?

2          A.   I WAS NOT.

3          Q.   HAVE YOU SEEN IT?

4          A.   I HAVE NOT.

5          Q.   IT INDICATES HERE THAT YOU HOLD CERTIFICATION

6   NUMBER 133-521 FROM THE NATIONAL ASSOCIATION OF MARINE

7   SURVEYORS?

8          A.   YES.

9          Q.   WHAT IS THAT A CERTIFICATE TO DO?

10         A.   THE THINGS THAT WE'VE JUST TALKED ABOUT.

11         Q.   IT SAYS HERE, "CERTIFIED HULL AND MACHINERY"?

12         A.   UH-HUH.

13         Q.   DOES NAMS ALSO CERTIFY, UNDER THAT CERTIFICATE,

14  YOUR ABILITY TO DO ACCIDENT AND LOSS INVESTIGATIONS?

15         A.   NO.

16         Q.   THAT'S A SEPARATE ISSUE, ISN'T IT?

17         A.   THAT'S TOTALLY SEPARATE.

18         Q.   DO YOU DO ANY CARGO SURVEYING?

19         A.   NO.

20         Q.   STRICTLY HULL . . .

21         A.   STRUCTURE AND MACHINERY.

22         Q.   AND WHAT ABOUT THE ITEM HERE THAT SAYS, "MARINE

23  CONSULTANT"; IS THAT SOMETHING THAT NAMS HAS CERTIFIED YOU TO

24  DO?

25         A.   NO.

20

Case 4:04-cv-00063-V   Document 34-3   Filed 04/14/06   Page 12 of 22

1    Q.    WHAT WOULD YOU DESCRIBE THAT PART OF THE

2 BUSINESS TO BE?

3    A.    WHAT I'M DOING TODAY.

4    Q.    AS AN EXPERT WITNESS?

5    A.    YES.

6    Q.    YOU DID NOT ACTUALLY INVESTIGATE THE ACCIDENT IN

7 THIS CASE, CORRECT?

8    A.    NO, SIR.

9    Q.    WHEN WERE YOU FIRST HIRED?

10    A.    I DON'T RECALL THE EXACT DATE.   APPROXIMATELY A

11 YEAR AGO.   IT MAY BE IN THIS REPORT.   I DON'T RECALL.   IT

12 SEEMS LIKE IT'S BEEN APPROXIMATELY A YEAR AGO.

13    Q.    IT SAYS HERE, UNDER ITEM (3-B) - THAT YOU ARE A

14 MEMBER OF THE INTERNATIONAL ASSOCIATION OF MARINE

15 INVESTIGATORS?

16    A.    RIGHT.

17    Q.    AND YOU ALSO HOLD A CERTIFICATE FROM THEM?

18    A.    YES, SIR.

19    Q.    WHAT IS THAT A CERTIFICATE TO DO?

20    A.    PERFORM INVESTIGATIONS IN THE MARITIME REALM.

21    Q.    WHAT TYPE OF INVESTIGATIONS?

22    A.    ACCIDENT INVESTIGATIONS, LOSS INVESTIGATIONS,

23 THEFT.

24    Q.    FIRE?

25    A.    I'M NOT A C.F.I.

21

1    REMEMBER HIS NAME NOW, THAT HAS THE BOAT U.S. FRANCHISE HERE,

2    THEY PROVIDE TOWING AND SALVAGE SERVICES, CORRECT?

3           A.    CORRECT.   TOWING SERVICES; I DON'T KNOW ABOUT

4    THE SALVAGE SIDE OF IT.   I JUST KNOW THE TOWING.

5           Q.    SIMILAR TO WHAT YOU UNDERSTAND SEA TOW TO

6    PROVIDE LOCALLY, CORRECT?

7           A.    YES, ABSOLUTELY.

8           Q.    HAVE YOU EVER DONE ANY SALVAGE WORK ON

9    RECREATIONAL VESSELS FOR THE LOCAL BOAT U.S. FRANCHISEE?

10          A.    NO.

11          Q.    BESIDES THE TOWING AND SALVAGE WORK INVOLVING

12   RECREATIONAL VESSELS THAT YOU'VE DESCRIBED THAT YOU'RE DOING

13   FOR CARTERET TOWING AND MOREHEAD CITY TOWING, IS THERE ANY

14   OTHER RECREATIONAL TOWING, OR RECREATIONAL SALVAGE WORK THAT

15   YOU'VE DONE?

16          A.    WITH THE COAST GUARD, YES, SIR.

17          Q.    I'M SORRY, YOU'RE RIGHT; ALSO WITH THE COAST

18   GUARD.   BUT BESIDES THOSE THREE, THE TWO TOWING COMPANIES AND

19   THE COAST GUARD?

20          A.    ONLY AS A GOOD SAMARITAN.

21          Q.    TELL ME ABOUT THAT?

22          A.    JUST OCCURS FROM TIME TO TIME, A VESSEL IS

23   AGROUND OR DISABLED, AND YOU HELP THEM.   YOU TOW HIM OFF, TOW

24   HIM IN, DO WHATEVER.

25          Q.    HAVE YOU EVER CLAIMED A SALVAGE, OR A RIGHT TO A

                                 25

1     A.   YES.

2          Q.   AND THEN IT INDICATES YOU ARE AN INSTRUCTOR ON

3     THE SUBJECT OF MARINE ACCIDENT INVESTIGATIONS FOR TWO

4     OUTFITS, THE NORTH CAROLINA INSURANCE CRIMES INFORMATION

5     EXCHANGE?

6          A.   UH-HUH.

7          Q.   WHEN DID YOU PROVIDE THAT INSTRUCTION?

8          A.   THREE YEARS AGO.

9          Q.   WAS IT JUST ONE SEMINAR?

10         A.   YES.

11         Q.   WHAT WERE YOU ACTUALLY TALKING ABOUT?

12         A.   MARINE THEFT.

13         Q.   AND THEN IT ALSO INDICATES THAT YOU HAVE SPOKEN

14    AT AN A.B.Y.C. CONFERENCE ON ACCIDENT INVESTIGATIONS?

15         A.   YES, SIR.

16         Q.   IS THAT JUST ON THE SUBJECT OF FIRE AND ARSON?

17         A.   FIRE, ARSON, IN THAT ONE, YES, SIR.

18         Q.   SO NONE OF THOSE INSTRUCTIONAL EXPERIENCES

19    INVOLVE RECREATIONAL VESSELS, SALVAGE OR TOWING?

20         A.   NO, SIR.

21         Q.   TELL ME, IF YOU WILL, JUST IN YOUR OWN WORDS,

22    WHAT IS IT ABOUT YOUR EXPERIENCE THAT LEADS YOU TO BELIEVE

23    THAT YOU'RE AN EXPERT IN THE SUBJECT OF RECREATIONAL TOWING,

24    OR RECREATIONAL SALVAGE?

25         A.   I WOULD BASE THAT ON HUNDREDS OF VESSELS,

27

1  RECREATIONAL VESSELS, THAT I HAVE TOWED AND/OR SALVAGED, MANY

2  OF THEM SURF OPERATIONS.  THE FACT THAT I WAS AWARDED THE

3  COAST GUARD ACHIEVEMENT MEDAL FOR DEVELOPING AND TEACHING THE

4  COAST GUARD CURRICULUM ON REMOVING VESSELS FROM SURF

5  OPERATIONS I THINK WOULD QUALIFY ME AS AN EXPERT.

6          Q.    IS THAT A PUBLICATION, IS THAT A BOOK THAT YOU

7  ASSISTED IN PREPARING?

8          A.    IT EXISTS SOMEWHERE, YES.

9          Q.    BUT IT'S A BOOK THAT YOU ASSISTED IN PREPARING?

10         A.    YES, SIR.

11         Q.    WHEN WAS THAT CREATED?

12         A.    IN THE 1980'S.

13         Q.    AND IT'S A COAST GUARD MANUAL?

14         A.    I DON'T KNOW WHAT IT IS.

15         Q.    DO YOU STILL HAVE A COPY OF IT?

16         A.    I DO NOT.

17         Q.    WHAT WAS THE TITLE OF IT?

18         A.    SURF RESCUE OPERATIONS.

19         Q.    TELL ME WHICH COMMAND YOU WERE ATTACHED TO?

20         A.    COAST GUARD FORT MACON.

21         Q.    CAN YOU TELL ME ABOUT HOW BIG OF A BOOK IT IS,

22  OR MANUAL?

23         A.    TWENTY PAGES, HALF SIDE, THAT'S WITH

24  ILLUSTRATIONS.

25         Q.    AND YOUR RECOLLECTION, THAT WAS BACK IN THE

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    1980'S?

2              A.    CORRECT.

3              Q.    WAS IT CLOSER TO 1980 OR 1990?

4              A.    I WOULD GUESS MID 80'S.

5              Q.    DID ANYBODY ASSIST IN THE CREATION OF THIS

6    MANUAL?

7              A.    YES.

8              Q.    WHO DO YOU RECALL HELPING YOU?

9              A.    CHIEF WARRANT OFFICER HYATT.

10             Q.    IS THAT H-Y . . .

11             A.    A-T-T.

12             Q.    IS MISTER HYATT STILL ALIVE?

13             A.    YES, HE IS.

14             Q.    DOES HE LIVE IN THIS AREA?

15             A.    HE DOES NOT.

16             Q.    DO YOU KNOW WHERE HE LIVES?

17             A.    HE LIVES IN FLORIDA.

18             Q.    DO YOU KNOW WHAT CITY?

19             A.    I DO NOT.

20             Q.    DO YOU RECALL HIS FIRST NAME?

21             A.    LONNIE.

22             Q.    ANYBODY ELSE BESIDES MISTER HYATT THAT YOU

23   RECALL ASSISTING YOU IN THE PREPARATION OF THIS MANUAL?

24             A.    NO, SIR.

25             Q.    TO YOUR RECOLLECTION, IN CONNECTION WITH SURF

29

1   RESCUE OPERATIONS, DID IT IN ANY WAY ADDRESS THE NEED TO

2   ANCHOR A VESSEL BEFORE ENGAGING IN SURF RESCUE OPERATIONS?

3          A.   YES, SIR.

4          Q.   AND WAS THIS A RECOMMENDATION THAT, IN THE

5   MANUAL, WAS MANDATORY, OR A REQUIREMENT, WHEN ENGAGING SURF

6   RESCUE OPERATIONS?

7          A.   IT WAS THE S.O.P.

8          Q.   OF THE COAST GUARD?

9          A.   FOR OUR OPERATIONS, FOR WHAT - OUR MANUAL, YES.

10         Q.   WAS THIS MANUAL APPLICABLE BEYOND THE COMMAND AT

11  FORT MACON; DID IT HAVE ANY WIDER APPLICATIONS?

12         A.   YES, SIR.  I KNOW IT WAS FORWARDED TO

13  HEADQUARTERS FOR DISSEMINATION.  WHERE IT WENT FROM THERE, I

14  HAVE NO RECOLLECTION.

15         Q.   ANYTHING ELSE - OKAY, WE'VE TALKED ABOUT THIS

16  MANUAL TO SOME EXTENT, BUT ANYTHING ELSE BESIDES THIS MANUAL

17  THAT YOU THINK, IN YOUR OWN MIND, QUALIFIES YOU AS AN EXPERT

18  TO TALK ON THE SUBJECT OF THE SALVAGE OR TOWING OF

19  RECREATIONAL VEHICLES?

20         A.   AS I SAID EARLIER, JUST MY EXPERIENCE, AND THE

21  NUMBER OF VESSELS, WHICH I HAVE PARTICIPATED IN PERSONALLY.

22         Q.   YOU MADE REFERENCE TO HUNDREDS, IF I'M CORRECTLY

23  QUOTING YOU?

24         A.   YES, SIR.

25         Q.   THAT WOULD INVOLVE BOTH TOWING AND SALVAGE?

30

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1          A.    YES, SIR.

2          Q.    GIVE ME SOME IDEA OF THE UNIVERSE WHERE YOU WERE

3    ACTUALLY INVOLVED IN PULLING RECREATIONAL VESSELS OFF OF

4    EITHER A BAR OR THE ROCKS, OR SOME CONDITION WHERE THEY WERE

5    CLEARLY STRANDED?

6          A.    PLEASE CLARIFY WHAT YOU MEAN BY "UNIVERSE"?

7          Q.    I'M SORRY.  YOU SAID, HUNDREDS OF TOWING AND

8    SALVAGE OPERATIONS, AND I'M TRYING TO SORT OF NARROW THAT

9    DOWN; IF YOU COULD TELL US HOW MANY OF THOSE WOULD HAVE

10   ACTUALLY INVOLVED TOWING A VESSEL IN DISTRESS OFF OF THE

11   SHORE, WHETHER IT WAS A SANDY BAR OR A ROCKY SHORE?

12         A.    IT'S PROBABLY GOING TO BREAK DOWN, I WOULD SAY

13   10 TO 15 PERCENT WERE PROBABLY GROUNDINGS, AND THE OTHER 85

14   PERCENT TO 90 PERCENT WERE DISABLED.

15         Q.    AND JUST SO I'M CLEAR THEN, THE LAST TIME YOU

16   ACTUALLY PERSONALLY PARTICIPATED IN PULLING A VESSEL OFF THE

17   SHORE WAS HOW LONG AGO?

18         A.    LAST SUMMER.

19         Q.    THAT'S WHEN YOU WERE RUNNING AROUND ON YOUR 18

20   FOOT CENTER CONSOLE?

21         A.    ACTUALLY, A FRIEND OF MINE'S BOAT.

22         Q.    HE MANAGED TO GET HIMSELF STRANDED?

23         A.    NO.  WE USED HIS BOAT TO PULL THE OTHER BOAT

24   OFF.

25         Q.    WAS THAT LOCALLY?

31

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    A.    YES.

2    Q.    WAS IT JUST THE TWO OF YOU?

3    A.    YES.

4    Q.    WHO TOOK THE LINE TO SHORE?

5    A.    DIDN'T HAVE TO TAKE IT TO SHORE.

6    Q.    TELL ME THE LAST ONE THAT YOU REMEMBER BEING

7  INVOLVED IN THAT ACTUALLY INVOLVED SOMEONE HAVING TO TAKE A

8  LINE TO A BEACHED VESSEL?

9    A.    IN FACT, MY RECOLLECTION IS THAT MISTER BOLSTER

10 AND I WERE THERE AT THE SAME TIME, AND IT WAS NOT A

11 RECREATIONAL VESSEL, BUT A COMMERCIAL VESSEL ON THE BEACH AT

12 SHACKLEFORD.  THIS WAS BEFORE HE TOOK OVER THE SEA TOW

13 OPERATION.  AND THE OTHER TOWING COMPANY, NOT THE BOAT U.S.,

14 BUT MIKE BROWN WAS THE SALVER, AT THE TIME.  MISTER BOLSTER,

15 AS I RECALL, WORKED FOR HIM.  I KNOW MARTY WENT ON THE BEACH.

16    Q.    HOW LONG AGO WAS THAT?

17           MR. BOLSTER:  '94.

18           MR. CHAPMAN:  OKAY.  YOU GUYS ARE NOT SUPPOSED

19 TO TALK TO EACH OTHER DURING THE DEPOSITION.

20    A.    I APPRECIATE YOUR PROMPTING.  APPROXIMATELY TEN

21 YEARS AGO.  I ACTUALLY THOUGHT MISTER BOLSTER WAS GOING TO

22 FREEZE TO DEATH.  IT WAS A VERY COLD DAY, AS I RECALL.

23    Q.    WHO SWAM THE LINE TO SHORE?

24    A.    MISTER BOLSTER.

25    Q.    IF YOU COULD, TURN TO PAGE 2 OF YOUR REPORT.

32

1    EXACTLY WHAT WAS OCCURRING.

2         Q.    WELL, LET ME ASK YOU THIS, CAPTAIN MIDGETT, IN

3    HIS TESTIMONY, SAID THAT HE TOLD DOCTOR WALKER TO GO OVER THE

4    PORT SIDE?

5         A.    YES.

6         Q.    AND YET, DOCTOR WALKER WENT OVER THE STARBOARD

7    SIDE?

8         A.    YES.

9         Q.    NOW, IN TERMS OF YOUR OPINIONS IN THIS CASE, IS

10   YOUR OPINION THAT CAPTAIN MIDGETT WAS NEGLIGENT DEPENDENT

11   UPON BELIEVING THAT DOCTOR WALKER WAS NEVER TOLD WHICH SIDE

12   TO GO OVER?

13        A.    NOR WAS HE TOLD TO GO ON THE STARBOARD SIDE,

14   WHICH MISTER SPARKS SAYS WAS THE WAY THAT CAPTAIN MIDGETT

15   WOULD HAVE DONE IT.

16        Q.    AGAIN, THAT'S MY QUESTION; IS YOUR OPINION THEN

17   DEPENDENT UPON BELIEVING WHAT DOCTOR WALKER SAYS ABOUT WHAT

18   HE WAS TOLD, TO GO OVER THE STARBOARD, OR HIS NOT BEING TOLD

19   WHICH SIDE TO GO OVER?

20        A.    YES, SIR.

21        Q.    AND SO IN TERMS OF YOUR OPINION, YOU REJECT THE

22   TESTIMONY OF CAPTAIN MIDGETT ABOUT TELLING DOCTOR WALKER TO

23   GO OVER THE PORT SIDE?

24        A.    YES.

25             MR. WEEKS:  I'M GOING TO OBJECT TO THE FORM OF

                              45

STATE OF NORTH CAROLINA          )
                                 )      C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF CARTERET               )

    I, O.D. LANDRY, CVR-CM-HM, A COURT REPORTER AND

NOTARY PUBLIC IN AND FOR THE AFORESAID COUNTY AND STATE, DO

HEREBY CERTIFY THAT THE FOREGOING PAGES ARE AN ACCURATE

TRANSCRIPT OF THE DEPOSITION OF DONALD WAYNE DAVIS, WHICH WAS

TAKEN ON BEHALF OF SEA TOW SERVICES OF CARTERET COUNTY, BY ME

BY STENOMASK, AND TRANSCRIBED BY DEBORAH STONE, UNDER MY

DIRECT, PERSONAL SUPERVISION.

    I FURTHER CERTIFY THAT THE DEPONENT WAS FIRST DULY

SWORN BY ME, AND THAT THE DEPONENT WAS NOT REQUIRED TO REVIEW

THE DEPOSITION.

    I FURTHER CERTIFY THAT NEITHER I, NOR THE SAID

TRANSCRIPTIONIST, IS FINANCIALLY INTERESTED IN THE OUTCOME OF

THIS ACTION, A RELATIVE, EMPLOYEE, ATTORNEY OR COUNSEL OF ANY

OF THE PARTIES, NOR A RELATIVE OR EMPLOYEE OF SUCH ATTORNEY

OR COUNSEL.

    WITNESS, MY HAND AND SEAL, THIS DATE:  DECEMBER 6,

2004.

    MY COMMISSION EXPIRES DECEMBER 7, 2008.



**/S/ O.D. LANDRY**

    O.D. LANDRY, CVR-CM-HM
    COURT REPORTER AND NOTARY PUBLIC
    COASTAL COURT-REPORTING AGENCY, INC.
    P.O. BOX 788 (236-B CHATHAM STREET)
    NEWPORT, NC  28570